UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-131-RJC-DCK

| PRASSAS CAPITAL, LLC, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) ORDER |
| BLUE SPHERE CORPORATION, | ) |
| Defendant. | ) |

**THIS MATTER** is before the Court on Prassas Capital, LLC's ("Plaintiff") Motion to Dismiss Blue Sphere Corporation's ("Defendant") Counterclaims, (Doc. No. 13); its Memorandum in Support, (Doc. No. 14); Defendant's Memorandum in Opposition, (Doc. No. 20); and Plaintiff's Reply in Support of it Motion to Dismiss, (Doc. No. 26).

## I. BACKGROUND

### A. Procedural Background

On March 15, 2017, Plaintiff filed its complaint alleging that Defendant breached its contract with Plaintiff requiring the payment of a financing fee in return for Plaintiff's help arranging a financing agreement. (Doc. No. 1 at 2). Defendant then filed an answer accompanied by counter claims. (Doc. No. 7). In response, Plaintiff filed its Motion to Dismiss Counter Claims. (Doc. No. 13).

### B. Factual Background

The facts alleged in Plaintiff's Complaint are as follows. Plaintiff is an Arizona limited liability company with its principle place of business in Arizona. (Doc. No. 1 ¶ 1). Defendant is a corporation organized under the laws of Nevada but maintains its principle place of business in

in Mecklenburg County, North Carolina. (Id. ¶ 2); (Doc. No. 7 at 2). Plaintiff alleges that it entered into an agreement ("the Agreement") with Defendant around December 30, 2013. (Doc. No. 1-1). The Agreement provided that Plaintiff would aid Defendant with financial advisory services in relation to two "waste-to-energy" projects Defendant aimed to complete. (Doc. No. 1 ¶ 6). These projects would take place in Mecklenburg County, North Carolina ("NC Project") as well as Johnston, Rhode Island ("RI Project"). (Id.). Plaintiff asserts that the terms of the Agreement provided that, upon the closing of any financing agreement, Plaintiff would be owed a financing fee. (Id. ¶ 6).

After the Agreement was finalized, Plaintiff argues that both the NC and RI Projects received financing and that, pursuant to the Agreement, Plaintiff is now owed its financing fee. (Id. ¶¶ 8–9, 11–12). The NC Project financing fee amounted to $1,640,651 under the Agreement while the RI Project fee amounted to $800,000. (Id. ¶¶ 9, 12). Of these fees, Plaintiff states that Defendant paid part, but not all, of the required fees. Of the $1,640,651 owed for the NC Project, Plaintiff claims that Defendant paid $300,000, leaving an outstanding balance of $1,340,651. (Id. ¶ 10). Of the $800,000 owed for the RI Project, Plaintiff claims that Defendant was unable to pay that fee and, as a result, a second agreement was made between the parties to parse out the terms of the project's payment of financing fees. (Id. ¶ 13); see also (Doc. No. 1-2). This second agreement ("Letter Agreement") provided that Defendant agreed to: (1) pay Plaintiff the $800,000 in installments; and (2) grant 7,000,000 warrants to purchase 7,000,000 shares of common stock in Defendant's corporation. (Id. ¶ 14). To date, Plaintiff states that Defendant paid a total of $533,333.33 toward the RI Project balance, leaving $266,666.67 unpaid. (Id. ¶ 16).

Not only does Plaintiff allege that Defendant failed to pay the requisite fees for the NC Project under the Agreement, but they also allege that Defendant then breached the Letter

Agreement by failing to make its payment installments. (Id. ¶ 17). As a result, Plaintiff claims that they began demanding payment from Defendant to pay the balance of both projects. (Id.). In response, Plaintiff claims that Defendant, through its CEO, Shlomo Palas, reaffirmed its obligations to pay Plaintiff and asked for further accommodations due to expected future sources of revenue. (Id.). According to Plaintiff, the last affirmation from Palas took place as recently as January 25, 2017. (Id.). Today, Plaintiff states that Defendant has yet to pay the remaining balances on the NC and RI Projects. (Id. ¶ 18). Plaintiff believes that Palas' promise to repay Plaintiff were false and made with the intent to delay Plaintiff's action to collect. (Id.). Plaintiff brings this action to recover the balance remaining under both agreements.

Defendant disagrees with Plaintiff's explanation of Defendant's obligations. In fact, Defendant claims that Plaintiff wrongfully demanded payment under the terms of the two agreements. First, Defendant claims that neither agreement is valid. To begin with, Defendant points out that Plaintiff's attached exhibit of the first financial agreement was not signed. (Doc. No. 7 ¶ 6). Plaintiff has since produced a signed copy. (Doc. No. 15-1). Second, Defendant contends that the agreements were void under the Securities Exchange Act ("SEA"). Defendant claims that, under the SEA, Plaintiff acted as a "broker" in "encouraging, soliciting, and facilitating financing transactions that constituted securities" under the act. (Doc. No. 7 ¶¶19–22). Defendant concludes that, because Section 15(a) of the SEA requires brokers to be registered, and because Plaintiff is not a registered broker, Section 29(b) of the SEA voids the agreements at issue. (Id.).

Even if the agreements were valid, Defendant states that the terms of the agreements were never fulfilled. Specifically, Defendant claims that a "closing" never occurred as defined by the agreement, thus preventing the triggering of paying a financial fee to Plaintiff. (Id. ¶ 7). Rather, "closing" was defined as the "receipt of funds in cash by the Company." (Id. ¶ 10). Because

Defendant never received "cash," a closing never occurred and Plaintiff was never owed a financing fee. (Id. ¶ 14). The only parties to receive cash, Defendant claims, were two limited liability companies that were neither subsidiaries nor affiliates to Defendant. Defendant also claims that it never received funds for "full financing" of either the NC or RI Projects. (Id. ¶ 11).

Defendant also makes the argument that Plaintiff misled Defendant. While Defendant admits to paying portions of Plaintiff's alleged financing fees, it claims that any payment was mistaken and resulted from Plaintiff's "wrongful, negligent, and/or fraudulent demand for payment under the terms of the Agreement." (Id. ¶¶ 10, 15). In making this argument, Defendant characterizes Plaintiff as fiduciary of sorts, stating that Plaintiff, "a sophisticated financial services company, and fiduciary to [Defendant]," was "well familiar with its own engagement agreements [and] wrongfully, negligently, and/or fraudulently demanded payment from [Defendant] under the Agreement." (Id. ¶ 15). Because Defendant lacked "similar sophistication and familiarity with the Agreement," Defendant claimed it mistakenly paid up to $833,333.00 to Plaintiff when that amount was never actually due. (Id. ¶ 16).

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim, the Court must accept the factual allegations of the claim as true and construe them in the light most favorable to the nonmoving party. Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 189 (4th Cir. 2010). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. A plaintiff therefore must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a

claim entitling [it] to relief, i.e., the 'plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678).

## III. DISCUSSION

Prior to addressing the Plaintiff's motion to dismiss Defendant's counter claims for failure to state a claim, the Court first acknowledges the choice of law clause found within the Agreement between Plaintiff and Defendant. It states:

> This Agreement and any claim or dispute of any kind or nature whatsoever arising out of or in any way relating to this Agreement, directly or indirectly, shall be governed by and construed in accordance with the laws of Arizona state applicable to contracts executed and to be wholly performed therein without giving effect to its conflicts of laws, principles or rules.

(Doc. No. 1-1). Neither Plaintiff nor Defendant have cited Arizona law in their memoranda or mentioned this clauses' applicability. Nonetheless, this Court finds it necessary to clarify the choice of law applicable to Defendant's counter claims.

When faced with contractual claims, "North Carolina courts generally apply the law of the place where the contract was made." Synovus Bank v. Coleman, 887 F. Supp. 2d 659, 668 (W.D.N.C. 2012). Additionally, "where the contracting parties have agreed 'that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.'" Id. (quoting Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980)). When it comes to tort claims, however, North Carolina courts traditionally apply the rule of *lex loci delicti*. Id. This rule mandates that, "[f]or actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Id. (quoting Boudreau v. Baughman, 368 S.E.2d 849, 853–54 (N.C.1988)). When it comes to financial loss, there is no bright-line rule determining where that injury took place. Id. Here, because Defendant's principle place of business is in North Carolina, and because one of the projects subject to the claims before

the Court is in North Carolina, the Court determines that the financial injury was felt in North Carolina. As such, the Court agrees with the parties that North Carolina law applies in regards to Defendant's tort counter claims.

A. The Validity of the Agreements

Choice of law clauses aside, the Court finds it essential to address the validity of the agreements between Plaintiff and Defendant before proceeding with Defendant's individual counter claims. In its Memorandum in Opposition, Defendant staunchly argues that its tort claims are rightfully brought in the stead of a breach of contract claim. (Doc. No. 20 at 5). Defendants support its stance by stating that the agreements at issue were voided from the moment of its execution because they violated the SEA.[1] (Id.).

Section 15(a)(1) of the SEA mandates that brokers and dealers must be registered with the Securities and Exchange Commission ("SEC"). [2] 15 U.S.C.A. § 78o (West). Citing this provision, Defendant alleges that, because Plaintiff is not a registered broker/dealer, the agreements between the two parties were void from the start. (Doc. No. 7 at 14). In constructing this argument,

---

[1]    Defendant also argues that the second agreement, the Letter Agreement, was void for lack of consideration as described by Plaintiff. (Doc. No. 7 at 15, 17). However, the Court notes that the Letter Agreement, as purported by Plaintiff, modified both parties' rights under the Agreement. "As long as both parties promise to give up an otherwise existing right at the time that they entered into a contract modification, that modification is supported by sufficient consideration." NRC Golf Course, LLC v. JMR Golf, LLC, 731 S.E.2d 474, 484 (N.C. App. 2012). Here, Plaintiff gave up the right to collect $800, 000 upfront for the collection of that sum in installments. In return, Defendant granted 7,000,000 warrants to purchase 7,000,000 shares of common stock in Defendant's corporation. (Doc. No. 1 at 3).

[2]    "It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section."

Defendant relies upon Section 29(b) of the SEA, which provides that contracts made in violation of the SEA and contracts in which its performance would involve a violation the SEA shall be void.³ 15 U.S.C.S. § 78cc (West).

Defendant's claim that the agreements with Plaintiff are invalid act as the keystone to Defendant's counterclaims. If the Court determined that the agreements were valid, the Defendant's counter claims fail. This is because of the economic loss rule which precludes parties from recovering economic loss in tort when those claims ought to be governed by contract law. North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co., 240 S.E.2d 345, 350 (N.C. 1978); see also Moore v. Coachmen Indus., 499 S.E.2d 772, 780 (N.C. App. 1998). Defendant thus relies on the absence of a valid agreement in order to bring its barrage of tort claims.

While the Court addresses a Motion to Dismiss, the validity of a contract is a legal conclusion and therefore not entitled to a presumption of truth. Charlotte Motor Speedway, LLC v. Cty. of Cabarrus, 748 S.E.2d 171, 175 (N.C. App. 2013) (citing Guarascio v. New Hanover Health Network, Inc., 592 S.E.2d 612, 614 (N.C. App. 2004)). The Court therefore finds it necessary to delve into the agreements' validity. As a result, the Court agrees with Plaintiff that, under the Supreme Court's ruling in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386–87 (1970), contracts violating the SEA are not void *per se*. Rather, Section 29 renders the "contract merely voidable at the *option* of the innocent party." Id. Courts have accordingly recognized an implied private, equitable cause of action for rescission.⁴ In doing so, those courts have interpreted Section

---

³ "Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void."
⁴ See Occidental Life Ins. Co. v. Pat Ryan & Associates, Inc., 496 F.2d 1255, 1266 (4th Cir. 1974), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); Reg'l Props., Inc. v. Fin.

29 of the SEA to provide a cause of action for rescission or similar equitable relief. Rhoades v. Powell, 644 F. Supp. 645, 662 (E.D. Cal. 1986), *aff'd sub nom*. Rhoades v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 961 F.2d 217 (9th Cir. 1992). A claimant may therefore exercise its right to rescind under Section 29(b) by either bringing an action to rescind or forming an affirmative defense to an enforcement claim. Dervan, 2017 U.S. Dist. LEXIS 28551, at *21 (citing Costello v. Grundon, 651 F.3d 614, 625-26 (7th Cir. 2011); GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 203-07 (3d Cir. 2001)).

In pursuing a rescission claim under Section 29(b) of the SEA, courts have required claimants to prove that: (1) the contract involved a "prohibited transaction;" (2) the plaintiff is in contractual privity with the defendant; and (3) the claimant is in the class of persons the SEA was designed to protect. Reg'l Properties, Inc. v. Fin. & Real Estate Consulting Co., 678 F.2d 552, 559 (5th Cir. 1982); see also Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 205 (3d Cir. 2006). For the purposes of this Motion to Dismiss, the Court assumes that Defendant has met the first element by alleging that Plaintiffs exceeded conduct allowed for the "finder" exception of Section 15(a)(1)'s registration requirement. The Court also recognizes that the record shows a signed agreement, (Doc. No. 15-1), and that Defendant would fall within the class of persons the SEA was designed to protect as they allege Plaintiff acted unlawfully to obtain Defendant's business.

Importantly, however, Defendant does not bring a rescission claim before this Court. Therefore, the Court finds that Defendant has not yet rescinded the contracts at issue. Rather, Defendant attempts to bring tort claims under the assumption that the agreements with Plaintiff

---

& Real Estate Consulting Co., 678 F.2d 552, 558 (5th Cir. 1982); Gannett Co. v. Register Pub. Co., 428 F. Supp. 818, 830 (D. Conn. 1977); Goldman v. Bank of Commonwealth, 332 F. Supp. 699 (E.D. Mich. 1971), *aff'd*, 467 F.2d 439 (6th Cir. 1972); Bache Halsey Stuart, Inc. v. Killop, 509 F. Supp. 256, 262 (E.D. Mich. 1980); Dervan v. Gordian Grp. LLC, No. 16-CV-1694 (AJN), 2017 U.S. Dist. LEXIS 28551, at *21 (S.D.N.Y. Feb. 28, 2017).

were never valid. Indeed, Defendant signed a six-page contract that clearly shows Plaintiff was not a registered broker or dealer. (Doc. Nos. 1-1, 15-1). Under Section J, the Agreement states, "[Plaintiff] will include an affiliate registered broker/dealer if the securities are transacted; who understands that the availability of a securities law exemption for the Financing may depend on such status." (Doc. No. 1-1 at 6). Defendant, therefore, was put on notice within the Agreement that they were navigating through an alleged exemption to the Section 15 registration requirement. Even if Plaintiff's actions in executing the Agreement were to exceed the excused conduct of such an exemption, Defendant at no point rescinded the contract under Section 19(b) of the SEA. Therefore, the Court finds that Defendant's proper counter claims must be those of contract, not tort law.

B. <u>Defendant's Fraud Counter Claim</u>

In its complaint, Defendant's counter claim for fraud alleges that Plaintiff's demand for the financing fee "under the representation it was owed pursuant to the Agreement" constituted fraud when Plaintiff knew: (1) the agreement was void under the SEA; and (2) the terms of the agreement were never met. (Doc. No. 7 at 15–17). Plaintiff argues that, even if the Court were to accept Defendant's allegations as true, they nonetheless fail to properly allege fraud. (Doc. No. 14 at 6). Rather than allege fraud in the formation of the contract or fraud in the inducement, Plaintiff claims that Defendant alleges fraud solely on Plaintiff's demand for payment when they were not entitled to it. Plaintiff characterizes Defendant's first counter claim as a manufactured tort claim when, in reality, the issue is one of breach of contract. (<u>Id.</u>). In that vain, Plaintiff argues that Defendant's fraud counter claim is barred by the Economic Loss Rule. (<u>Id.</u> at 6–7).

The Court agrees with Defendant that the economic loss rule does not preclude a fraud claim when the underlying dispute is one involving a breach of contract. The North Carolina

Supreme Court first outlined the economic loss rule in North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co., 240 S.E.2d 345, 350 (N.C. 1978), where a state agency brought suit after the roof of two buildings began to leak. The state agency not only sued for breach of contract, but also on a theory of negligence, claiming that the defendants failed to exercise proper care and craftsmanship applicable to roofs. Id. The court stated, "Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." Id.

While North Carolina Ports Authority seems to support Plaintiffs contention that Defendant's fraud claim is barred, North Carolina law has since differentiated fraud and negligence and their interactions with the economic loss rule. In Bradley Woodcraft, Inc. v. Bodden, the North Carolina Court of Appeals ruled that, "while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred and, indeed, '[t]he law is, in fact, to the contrary: a plaintiff may assert both claims[.]'" 795 S.E.2d 253, 259 (N.C. App. 2016) (quoting Jones v. Harrelson & Smith Contr'rs, LLC, 670 S.E.2d 242, 250 (N.C. App. 2008), *aff'd per curiam*, 677 S.E.2d 453 (N.C. 2009)); see also Oestreicher v. Am. Nat'l Stores, Inc., 225 S.E.2d 797, 806 (N.C. 1976) (allowing punitive damages where plaintiff alleged both the breach of a lease as well as fraud in the execution of that breach). It necessarily follows that, even if the agreements were valid, Defendant's fraud claim would be permissible. The pertinent question then becomes: Does Defendant sufficiently allege fraud? In this case, the answer is no.

To begin with, under North Carolina law, in order to establish a claim for fraud, the claimant must prove:

> (1) material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge of its falsity or in culpable ignorance of its truth; (4) that the misrepresentation was made with intention that it should be

> acted upon; (5) that the recipient of the misrepresentation reasonably relied upon it and acted upon it; and (6) that there resulted in damage to the injured party.

Rosenthal v. Perkins, 257 S.E.2d 63, 65 (N.C. App. 1979).  To plead fraud, the Federal Rules of Civil Procedure mandate a heightened standard.  Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 725 (M.D.N.C. 2015).  The rule states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. PROC. 9(b).  While "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," the plaintiff must nonetheless particularly describe "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Id.; Topshelf, 117 F. Supp 3d at 725 (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir.2008)). Furthermore, under North Carolina, as to either fraud or negligent misrepresentation, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." Hudson-Cole Dev. Corp. v. Beemer, 511 S.E.2d 309, 313 (N.C. App. 1999); see also Oberlin Capital, L.P. v. Slavin, 554 S.E.2d 840, 846–47 (N.C. App. 2001) (holding that a complaint failed to allege fraudulent concealment when "[Plaintiff] could have discovered the facts regarding the [] breach upon reasonably adequate inquiry" and when "[Plaintiff]'s complaint does not allege that it was denied the opportunity to investigate or that it could not have learned the true facts by exercise of reasonable diligence."); Rosenthal, 257 S.E.2d at 66 (dismissing plaintiffs' complaint as it failed to state a claim for relief based upon fraud when plaintiffs failed to allege that "they were denied the opportunity to investigate the premises or that they could not have discovered" flooding of a house).

In its complaint, Defendant alleges fraud by merely claiming:

> 27. Upon information and belief, Prassas, through its Managing Member, Nicholas Prassas, demanded a Financing Fee from Blue Sphere under the Agreement at a time when he knew Blue Sphere did not receive cash from the alleged financing and, as such, Prassas was not entitled to a Financing Fee.
>
> 28. Upon information and belief, Prassas demanded a Financing Fee from Blue Sphere under the representation it was owed pursuant to the Agreement at a time when it knew the Agreement was void under the SEA and, as such Prassas was not entitled to a Financing Fee.
>
> 29. Upon information and belief, Prassas demanded a Financing Fee from Blue Sphere under the representation it was owed pursuant to the Letter Agreement at a time when it knew or should have known it was not entitled to a Financing Fee under the Agreement and there was no valid consideration for the Letter Agreement.

(Doc. No. 7 at 15). While Defendant's counter claim does identify the person making the misrepresentation, as well as the contents of the misrepresentation, Defendant's counter claim lacks any assertion or allegation that Plaintiff hid its status as a party that did not register under the SEA or a party who had knowledge that the terms of the agreements were never met. Nor has Defendant alleged that Plaintiff prevented Defendant from ascertaining its status.[5] That is, Defendant's counter claim does not allege that it "was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." Hudson-Cole Dev. Corp., 511 S.E.2d at 313. The Court therefore finds that Defendant insufficiently alleged fraud in its counter claim.

C. Defendant's Breach of Fiduciary Duty Counter Claim

---

[5] In fact, as mentioned above, the Agreement seems clear on its face that Plaintiff was not a registered broker and that a registered affiliate broker/dealer would be needed if securities are transacted. (Doc. No. 1-1 at 6).

Next, Defendant counter claims for an alleged breach of fiduciary duty. In its agreements with Plaintiff, Defendant alleges that it entered a fiduciary relationship which Plaintiff breached when "it attempted to collect a Financing Fee that it was not entitled to receive since it knew no transaction had 'closed,' the agreement was void under the SEA, and the Letter Agreement lacked valid consideration." (Doc. No. 7 at 17). In characterizing this fiduciary relationship, Defendant described Plaintiff as "a sophisticated financial services company … well familiar with its own engagement agreements …." (Id. at 14). Meanwhile, Defendant stated it "was without the benefit of similar sophistication and familiarity with the Agreement" and thus erred in paying $833,333.00 due to Plaintiff's fraudulent billing. (Id.).

The Court first notes that Defendant's latest description comes after signing a mere five-page contract, which, under subsection G, Scope of Duties, explicitly states, "[Defendant] hereby acknowledges and agrees that: (a) it is a sophisticated business enterprise that has retained [Plaintiff] for the limited purposes set forth in this Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature …." (Doc. No. 1-1 at 5). That same clause goes on to state, "Both [Defendant and Plaintiff] disclaim any intention to impose fiduciary duties or obligation on the other by virtue of the engagement contemplated by this Engagement Agreement …." (Id.).

Defendant's sophistication aside, North Carolina law recognizes two general types of fiduciary relationships: "(1) those that arise from 'legal relations such as attorney and client, broker and client ... partners, principal and agent, trustee and cestui que trust,' and (2) those that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 659 S.E.2d 442, 451–52 (N.C. App. 2008) (quoting Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F.Supp.2d 540, 546

(M.D.N.C.1999)). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." Id. (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir.1998)).

While a broker has a fiduciary duty to its clients, the Court finds that Plaintiff was not a broker under the agreements with Defendant. Nor does Defendant dispute that Plaintiff never registered as a broker-dealer. Even if Plaintiff's acts, as alleged, violated federal law, this does not conclude that a fiduciary relationship was formed. See Cornhusker Energy Lexington, LLC v. Prospect St. Ventures, No. 8:04CV586, 2006 U.S. Dist. LEXIS 68959, at *32 (D. Neb. Sep. 12, 2006) (finding that a "finder," even if considered violating Section 15(b) of the SEA, does not constitute a registered broker-dealer and therefore does not create a fiduciary relationship). In this case, "[t]here has been no showing of any special relationship between the parties that would impose a fiduciary duty and there is no fiduciary duty imposed under the contract." Id.

Nor does the Court find that Defendant alleges Plaintiff to hold the requisite "control and domination" over Defendant to amount of a fiduciary duty. At most, Defendant alleges that it lacked sophistication to construe a six-page contract. It does not allege that Plaintiff acted on behalf of Defendant or that Defendant was under Plaintiff's dominion. In fact, quite the opposite is true. Under the Agreement, "[Plaintiff] will not, however, have any authority to bind [Defendant] or its shareholders to any third party with respect to any proposed Transaction." Doc. No. 1-1 at 3). "Likewise, nothing contained herein shall require [Defendant] to accept the terms of any proposal and [Defendant] shall at all times have the right in its sole and absolute discretion to reject any proposed Transaction regardless of the terms proposed." (Id.). All the Agreement

gave Plaintiff the power to do was furnish information to Defendant and help Defendant in its quest to find financing for its two waste-to-energy projects.

D. Defendant's Constructive Fraud Counter Claim

Defendant's next counter claim for constructive fraud fails for the very reasons its breach of fiduciary duty claim fails.

> In order to maintain a claim for constructive fraud, [the] plaintiffs must show that they and [the] defendants were in a "relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which [the] defendant[s] [are] alleged to have taken advantage of [their] position of trust to the hurt of [the] plaintiff[s]."

Babb v. Graham, 660 S.E.2d 626, 633 (N.C. App. 2008). North Carolina Courts have further established that a breach of fiduciary duty amounts to constructive fraud. Id. Because no fiduciary duty or relationship of trust and confidence exists between the parties, Defendant's constructive fraud claim must be dismissed.

E. Defendant's Negligence Counter Claim

As explained above, while the economic loss rule does not apply to fraud claims, it does apply to negligence claims in the face of a valid contract. Bradley Woodcraft, Inc. v. Bodden, 795 S.E.2d 253, 259 (N.C. App. 2016). Even after assuming Plaintiff violated the SEA by drafting the two agreements with Defendant, Defendant has yet to rescind those agreements through either a rescission claim or an affirmative defense.

F. Defendant's Unjust Enrichment Counter Claim

"The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply here where a contract exists between two parties." Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co., 594 S.E.2d 425, 429 (N.C. App. 2004). As explained above, Defendant has not brought a counter claim rescinding the agreements pursuant to Section 29(b) of the SEA.

As such, the Court treats those agreements as controlling, thus rendering Defendant's unjust enrichment counter claim inappropriate to consider at this time.

G. Defendant's Punitive Damages Counter Claim

Under North Carolina law, punitive damages are not typically allowed under breach of contract claims. Newton v. Standard Fire Ins. Co., 229 S.E.2d 297, 300 (N.C. 1976). An exception arises when a tort claim accompanies a breach of contract claim. Id. As the North Carolina Supreme Court put it in Oestreicher v. Am. Nat'l Stores, Inc., "In the so-called breach of contract actions that smack of tort because of the fraud and deceit involved, we do not think it is enough just to permit defendant to pay that which the lease contract required him to pay in the first place." 225 S.E.2d 797, 809 (N.C. 1976). It therefore follows that, even if Defendant does not rescind the agreements signed with Plaintiff, punitive damages would be available if Defendant sufficiently pleaded fraud. Unfortunately, Defendant did not sufficiently plead fraud and therefore its punitive damages claim must be dismissed accordingly.

## IV. CONCLUSION

The Court finds that Defendant fundamentally misconstrued Section 29(b) of the SEA. In an attempt to bring a barrage of tort claims, Defendant argues that its agreements with Plaintiff were void from their inception due to Plaintiffs' alleged violation of Section 15(a)(1) of the SEA. This simply isn't true. Defendant must actively exercise the option to void the contract, which it has yet to do. Although Defendants may bring a complimentary fraud claim and seek punitive damages,, Defendant fails to sufficiently plead fraud and, as a result, both the fraud claim and the claim for punitive damages must be dismissed along with Defendant's other counter claims.

**IT IS, THEREFORE, ORDERED** that**:**

1. Plaintiff's Motion to Dismiss Defendant's Counter Claims, (Doc. No. 13), is **GRANTED.**

Signed: March 30, 2018

Robert J. Conrad, Jr.
United States District Judge