**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**Charlotte Division**

**Case No. 3:17-cv-00131-RJC-DCK**


PRASSAS CAPITAL, LLC, an Arizona          )
limited liability company,                )
                                          )
                    Plaintiff,            )          **PLAINTIFF'S PRE-TRIAL BRIEF**
                                          )
          v.                              )
                                          )
BLUE SPHERE CORPORATION, a Nevada         )
corporation,                              )
                                          )
                    Defendant.            )
                                          )

     Plaintiff Prassas Capital, LLC ("PC" or "Plaintiff"), by and through counsel, hereby respectfully submits the following Pre-Trial Brief.

## I. INTRODUCTION

     As a result of the Court's Order on the parties' respective summary judgment motions (Doc. 97), this case has narrowed significantly and this trial should only involve three issues: "(1) which party breached the contract first, (2) whether PC substantially performed its obligations under the contract, and (3) what amount of damages, if any, are appropriate." (Doc. 97, p. 5). Defendant Blue Sphere Corporation ("BSC" or "Defendant") has indicated that it will attempt to relitigate issues the Court has already decided, but this trial should be about a straightforward breach of contract case.

1

## II. FACTUAL BACKGROUND

As explained previously, the case itself is really not complex. Plaintiff previously briefed the factual background of this case, (Doc. 60, pp. 2-8; Doc. 88, pp. 2-6), and for the sake of brevity and consistent with our understanding of the Court's direction, will not repeat that in full. What follows is a brief summary with additional facts to provide a full understanding of the evidence Plaintiff expects to be presented during trial.

### A. Undisputed Facts

BSC and Plaintiff entered into the that certain Engagement Agreement dated December 30, 2013 (the "Engagement Agreement") under which BSC engaged Plaintiff to find financing for its two waste-to-energy projects: the NC Project and the RI Project.[1] BSC initially asked Plaintiff to locate additional debt investors, specifically bond financing for its Projects, but despite great effort, Plaintiff was unable to locate such debt financing and reported the same to BSC. (Doc. 56, ¶¶ 3 and 5).

In or about October 2014, BSC lost all of its prior financing commitments and became desperate to quickly find equity financing. (Doc. 58-1 (hereinafter "First Palas Depo.") 49:13-16). As such, in late September or early October 2014, BSC reached out to Plaintiff—among others—and re-tasked Plaintiff to "look for – for equity, look for financing, you know, for the project." (First Palas Depo. 50: 3-11). Thereafter, Plaintiff followed a succession of contacts, referrals, and leads to locate Entropy Investment Management ("Entropy"), an affiliate of York Capital Management ("York Capital"), which provided necessary financing acceptable to BSC. (Doc. 56, ¶¶ 7-16).

In the words of Palas, BSC's CEO and 30(b)(6) witness:

> [Plaintiff] advised us – give us advice to approach York Capital. He told us at the time that they're hungry for exactly those type of projects, waste to energy, and he think that it would be a very good idea to speak with them.

(First Palas Depo. 51:17-21).

As a result of that introduction and in the fullness of time, transactions related to the two Projects closed in early 2015. According to a press release issued by BSC on February 9, 2015 (which will be introduced as an exhibit during trial), BSC closed "a joint venture (the 'Closing') to develop, construct and operate a 5.2 MW biogas generation facility in Charlotte, NC (the 'Project') with affiliates of York Capital Management." As stated by Palas in that press release, "We closed on a joint venture to develop a significant food waste to energy facility in the United States . . . . We booked our first revenue in the history of the Company from the cash payment received at the Closing . . . ."[2]

Plaintiff found and introduced BSC to Entropy and York Capital, and within three to five months thereafter, York/Entropy and BSC entered into joint ventures with respect to both the NC and RI Projects, by virtue of which York, as BSC's joint venture partner, contributed approximately $47,000,000 to fund the development and construction of the NC and RI Projects resulting in BSC receiving substantial cash payments at the closing of these two transactions. On that basis alone, under the Engagement Agreement, BSC owed Plaintiff a Financing Fee in the amount of $1,640,651.52 for the NC Project and $1,146,000.00 for the RI Project. Prior to this litigation, BSC paid Plaintiff without protest (other than inability to pay) $300,000 for the NC

---

[1] Capitalized terms not otherwise defined herein take meaning from Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment. (Doc. 60).

[2] BSC issued a similar press release following the closing of the RI Project wherein Palas again stated "we closed on a joint venture to develop a second significant food waste to energy facility in the United States . . . . We booked our second round of revenue in the history of the Company from the cash payment received at the closing of the Joint Venture."

Project and $533,333 for the RI Project, leaving a balance owed for both Projects of $1,953,318.52.[3]

## B. Fact Issues

Putting aside BSC's attempt to resurrect its broker-dealer defense,[4] there seem to be only two issues for trial on Plaintiff's breach of contract claim: (1) whether Plaintiff sufficiently or substantially performed under the Engagement Agreement; and (2) whether the parties modified the amount of Financing Fee owed with respect to the NC Project.

On the first issue, although BSC now contends Plaintiff failed to perform, (*See* Doc. 90, pp. 2-8), the evidence at trial will show that Plaintiff did plenty for BSC in the course of its advisory work for BSC, including everything it was asked to do and needed to do with respect to the NC and RI Projects. The evidence will tend to show that, following the introduction of BSC and York and the exchange of the initial term sheets, BSC largely kept Plaintiff in the dark and chose to handle the negotiations and closings of the NC and RI Project transactions on its own without heavy Plaintiff involvement. Plaintiff performed as it was required, and BSC did not need, ask for, or even want Plaintiff's assistance in most aspects of the work to close these transactions.

On the second issue, BSC continues to assert that the parties agreed to subsequent modifications of the Engagement Agreement with respect to the Financing Fee owed for the NC Project. These alleged modifications take the form of email communications between Prassas

---

[3] Although the parties entered into the Letter Agreement to modify the Financing Fee for the RI Project, BSC has admitted that it failed to perform as required under the Letter Agreement. As a result of BSC's stipulated non-performance under the Letter Agreement, Plaintiff retains the right to seek enforcement of the Engagement Agreement and recover the full amount of the Financing Fee owed for the RI Project. BSC has made no attempt to dispute Plaintiff's position in this regard and presented no evidence to dispute Plaintiff's calculation of the Financing Fee owed for the RI Project. As such, the Court can determine, as a matter of law, the amount of Financing Fee owed with respect to the RI Project.

and Palas (not in the manner required by the Engagement Agreement and as demonstrated in the Letter Agreement). For the reasons explained more fully below, BSC will be unable to provide evidence that Plaintiff intended these informal, conversational emails to constitute a binding agreement to modify the Engagement Agreement in the first place. But beyond that, there is no evidence that any such modification was supported by sufficient consideration or that any such modification satisfied the Arizona statute of frauds.

There is also a third issue that should not be presented to the jury. BSC contends that it never received cash in connection with the closing of these transactions, as it claims is required under the Engagement Agreement. But there is no dispute that BSC received cash in connection with the closings of these transactions ($1,250,000 for the NC Project and $1,481,900 for the RI Project), and, indeed, the Engagement Agreement makes plain that the calculation of the Financing Fee is not based solely on the cash received by BSC. Instead, the Engagement Agreement unambiguously states that the Financing Fee is calculated as 6.0% of Traditional Equity, which is defined to include "the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plan and equipment or any other assets." (Doc. 1-1, p. 4).

As BSC admits it received cash payments at the closings, that these transactions resulted in joint ventures, and that York, as BSC's joint venture partner, contributed approximately $47,000,000 into the joint ventures, the jury need not decide any factual issues on this point. Instead, the Court can and should—to the extent it has not already removed this issue from the case—determine that the "receipt of cash" requirement was satisfied as a matter of law based on admitted facts and unambiguous language in the Engagement Agreement.

---

[4] The Court unambiguously struck this defense at the summary judgment stage (Doc. 97, pp. 2-3), and, as explained

### III. EVIDENTIARY ISSUES

#### A. Plaintiff's Motion in Limine

Plaintiff filed a Motion in Limine (Doc. 102) seeking to (1) prevent BSC from relitigating its previous claim or defense that Plaintiff violated the Securities Exchange Act (the "SEA") by not being a registered broker-dealer; (2) exclude any expert testimony, including expert testimony related to Plaintiff's performance or services provided, whether Plaintiff was acting as a broker or finder in rendering such performance, whether Plaintiff's performance violated the SEA, or any other matter upon which BSC may attempt to offer expert testimony; and (3) exclude any evidence or argument related to Plaintiff's conduct or registration as a Registered Investment Advisor. Plaintiff briefed these issues in its accompanying brief in support (Doc. 103) and will not repeat those arguments here.

#### B. BSC's Motions in Limine

BSC filed two Motions in Limine: (1) seeking to exclude Plaintiff's expert testimony and report; and (2) seeking to exclude various subjects and evidence, as described therein and addressed more fully in Plaintiff's Omnibus Response to Defendant's Motions *In Limine* to Exclude Certain Evidence and Arguments filed contemporaneously herewith.

#### C. Other Expected Evidentiary Issues

In addition to the above, BSC should be precluded from presenting any evidence at trial related to any specific amount of damages suffered by BSC as a result of Plaintiff's alleged nonperformance. In its Rule 26 disclosures, the only damages identified were, again, the "$833,333.00 in payments Prassas wrongfully claimed and accepted."

In response to BSC's amended counterclaim for breach of contract, Plaintiff served additional interrogatories requesting BSC to state "with specificity the amount and type of

---

below, BSC should not be permitted to revive this defense by simply calling it a different name.

damages you suffered as a result of PC's alleged nonperformance." [Doc. 86-7, p. 5]. In response, BSC again identified the $833,333 "for services it never received," but stated that it "has not calculated the amount of lost opportunity cost and significant use of corporate resources to perform tasks within Prassas Capital's scope at this time." *Id.* In summary judgment papers and at the summary judgment hearing, the only damages BSC argued it suffered was its payment of $833,333 to Plaintiff under the Engagement Agreement.

BSC has not supplemented either its Rule 26 initial disclosures or discovery responses to disclose any computation of damages as required by Rule 26(a) and (e). When a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (2019). Pursuant to Rules 26(a) and (e) and 37(c)(1), BSC should be precluded from presenting any evidence of specific damages it suffered as a result of Plaintiff's alleged nonperformance.

With respect to BSC's contention that it is entitled to recover the $833,333 previously paid to Plaintiff, there is no legal theory in this case that would allow BSC reimbursement of that full amount. Reimbursement of the amount paid under the Engagement Agreement is a remedy arising from rescission—a defense the Court has clearly struck in this case.

In addition, BSC admits that it cannot recover the full $833,333 in this case. During his second deposition, Palas, on behalf of BSC, freely testified that "Prassas need to get fees. I never said that he is not entitled to get fees. Okay?" (Doc. 86-1 (hereinafter "Second Palas Depo.") 158:10-11). Palas's testimony constitutes an admission that Plaintiff is entitled to receive at least some amount of fees. BSC's argument in this case is not that Plaintiff is entitled to receive nothing and that BSC should be reimbursed the full $833,333 it already paid, but

rather that Plaintiff did valuable work as a finder and deserves to get paid something as a finder. (Second Palas Depo. 169:9-10 ("[Plaintiff] did excellent work as a finder"); 177:5-8 (ability to find investor is "a valuable service from anyone")); 160:3-8 (agreeing Plaintiff "deserves to get paid . . . as a finder")).

BSC, however, has never disclosed what that amount should be and how much, if any, Plaintiff has been overpaid. Not only would such evidence be speculative, but would be highly prejudicial to Plaintiff because it has never been disclosed. BSC was required to disclose that information under Rule 26, and its failure to do so precludes BSC from presenting evidence of that amount under Rule 37(c). *See Nelson-Salabes, Inc. v. Morningside Dev.*, 284 F.3d 505, n. 10 (4th Cir. 2002) (affirming district court's exclusion of testimony related to undisclosed expenses incurred by defendants).

Because BSC cannot present any evidence of actual damages (whether those be specific damages resulting from Plaintiff's nonperformance or damages in the form of overpayment because Plaintiff allegedly should only receive fees as a finder), BSC's breach of contract claim should not be presented to the jury. At best for BSC, the jury can determine that BSC is not required to pay any further amount to Plaintiff if it finds that Plaintiff did not substantially perform its obligations, but there is no legal theory or factual basis from which a jury could conclude that Plaintiff has to repay any portion of the $833,333 it already received.

For the avoidance of doubt, Plaintiff has not yet seen BSC's exhibit list as of July 1, 2019 and does not yet know of any evidentiary issues related to BSC's proposed exhibits. Plaintiff reserves its right to object to any exhibits or testimony offered by BSC during the trial of this matter.

## IV. LEGAL ISSUES FOR TRIAL

Plaintiff expects the following legal issues to be presented to the Court during the trial of this matter:

### A. Plaintiff's Claim for Breach of Contract

Under Arizona law, "[i]n an action for breach of contract, the plaintiff has the burden of proving the existence of a contract, its breach and the resulting damages." *Dialog4Sys. Eng'g GMBH v. Circuit Research Labs, Inc.*, 622 F. Supp. 2d 814, 820 (D. Ariz. 2009) (citations omitted). Here, the Court has already determined that the Engagement Agreement and Letter Agreement constitute valid written contracts, signed by both parties and supported by sufficient consideration. (Doc. 42, pp. 6-9). Therefore, the first element of Plaintiff's breach of contract claim is satisfied and should not be submitted to the jury.

### i. Plaintiff performed as required under the Agreement

For the reasons previously argued by Plaintiff, (Docs. 60, pp 4-16; 72, pp. 2-14; and 78, pp. 2-11), the Engagement Agreement did not require Plaintiff to perform or prove each of the services enumerated in the Engagement Agreement and each of the conditions precedent to Plaintiff's right to receive payment of the Financing Fee (e.g., receipt of cash) were satisfied. As stated earlier, there is no longer any dispute that Plaintiff introduced BSC and York and advised BSC to speak with York regarding the financing of these Projects. There is also no dispute that BSC received cash at closing, that York and BSC formed a joint venture with respect to these Projects, and that York, as BSC's joint venture partner, contributed approximately $47,000,000 into the joint venture Projects.

Pursuant to the terms of the Engagement Agreement, the Financing Fee for both Projects amounts to $2,786,651.52, a calculation which BSC does not dispute. BSC has only paid

$833,333 of this amount, leaving a balance of $1,953,318.52 for the Financing Fee as calculated under the Engagement Agreement. There is no dispute that BSC has failed to pay this amount. The only issues with respect to Plaintiff's breach of contract claim is (1) whether Plaintiff substantially performed and (2) whether the parties entered into an enforceable modification agreement related to the NC Project Financing Fee.

### ii. Plaintiff substantially performed under the Agreement

Under Arizona law:

> [A] material breach occurs when (1) a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions or (2) fails to do something required by the contract which is so important to the contract that the breach defeats the very purpose of the contract. Conversely, substantial performance means that one party has performed all that is required by the contract, except for slight deficiencies in performance that can easily be cured. To determine whether a party has substantially performed his obligations, the court or jury should consider the nature of the promised performance, the purpose of the contract, and the extent to which any deficiencies in performance have defeated that purpose.

Id. at 822 (internal citations omitted).

It is also well established under Arizona law:

> Where a contract has been partly performed by one party and the other has derived a substantial benefit therefrom, the latter cannot refuse to comply with its terms simply because the former fails to complete performance. Where there has been part performance and there is a breach of a promise which goes to only a part of the consideration and the breach may be compensated for in damages, the breach does not relieve the other party from his obligation to perform his promise.

*Cracchiolo v. Carlucci*, 62 Ariz. 284, 292, 157 P.2d 352, 355 (1945).

Thus, instructing the jury on substantial performance will allow the jury to determine whether or not Plaintiff substantially performed its obligations under the Engagement Agreement

and resolve this issue appropriately. If the jury determines that Plaintiff substantially performed, BSC is not relieved of its obligations to perform and Plaintiff is entitled to recover the contract price. *See* RAJI (Civil) 10, Use Note (5th ed.); *see also Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.*, 125 Ariz. 53, 60, 607 P.2d 372, 379 (1980).

### iii. The Financing Fee owed for the RI Project transaction is $613,000

If the jury finds in favor of Plaintiff on the substantial performance issue, the Court should determine that the amount of Financing Fee owed for the RI Project transaction is $613,000. As previously briefed, the parties entered into the Letter Agreement for the purpose of modifying the payment of the Financing Fee for the RI Project only, and BSC stipulates that it failed to timely make the payments due thereunder and further admits that a $133,333.33 payment, which was due upon the RI Project reaching COD in August 2017, was not paid. (Doc. 60, p. 11). The Letter Agreement provides that "unless and until full payment of the $800,000 and delivery of the Shares upon exercise of the Warrant is made to [Plaintiff], [Plaintiff] reserve[s] all of [Plaintiff's] rights under the Engagement Letter." (Doc. 1-2, p. 4).

BSC has made no effort to dispute Plaintiff's interpretation and application of this language in the Letter Agreement or Plaintiff's argument that it is entitled to enforce its rights under the Engagement Agreement and seek payment of the full Financing Fee for the RI Project based on such language. As such, there is no material issue for the jury to decide with respect to the amount owed for the RI Project Financing Fee (assuming the jury answers the substantial performance issue in Plaintiff's favor). If the jury finds in Plaintiff's favor on the substantial performance issue, the Court should award Plaintiff damages for the RI Financing Fee in the undisputed amount of $613,000.

### iv. BSC cannot enforce any alleged modification of the Agreement related to the Financing Fee owed for the NC Project transaction

BSC contends that following the closing of the NC Project transaction, the parties agreed to modify the Engagement Agreement with respect to the NC Project Financing Fee. (Doc. 67, pp. 19-23). Plaintiff disputes BSC's characterization of these email exchanges from a factual standpoint and contends that these emails were a series of negotiations and accommodations made because of BSC's professed inability to pay. To be clear, Plaintiff disputes that any subsequent agreement was ever entered into and that these emails reflect, at most, a negotiation that devolves into "two men arguing" and an "unresolved negotiation." (Doc. 72, p. 22). As the evidence will tend to show and as the Court is aware, at least one potential modification agreement, similar to the Letter Agreement, was drafted for this purpose, but never signed. (Doc. 56-2).

Putting aside this factual dispute regarding the intention and meaning of these subsequent email exchanges, BSC cannot enforce this asserted modification defense as a matter of law and this issue should not be presented to the jury.

### a.  Any alleged modification lacks sufficient consideration as a matter of law

As previously briefed, any modification of the Engagement Agreement requires all the elements of a contract, including proper consideration. (Doc. 72, pp. 23-24). "[C]onsideration necessary to modify an existing contract is any detriment to the promisee, or benefit to promisor that supports the new promise." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1144 (1999). Under this alleged modification, Plaintiff is the "promisor," as BSC is seeking to enforce a promise by Plaintiff to accept less than the full Financing Fee owed for the NC Project, and BSC is the promisee.

According to BSC's characterization of this modification, there is no dispute that BSC did not suffer any detriment, as the modification only served to reduce and delay the Financing Fee that BSC was already obligated to pay. Consideration for an alleged modification cannot "be something which a party is already bound to do." *Perry v. Farmer*, 47 Ariz. 185, 188, 54 P.2d 999, 1001 (1936).

Similarly, Plaintiff, as promisor, received no benefit from this alleged modification, as, according to BSC, it only reduced and delayed the Financing Fee that was already due. BSC has made no genuine effort to demonstrate that any sufficient consideration exists to support this alleged modification. Without any showing of such evidence, this issue should not be submitted to the jury.

### b. Any alleged modification fails to satisfy the Arizona statute of frauds

In addition to the lack of consideration, the modification BSC asserts as a defense fails to satisfy Arizona's statute of frauds. As the Court has observed, and BSC does not dispute, substantive Arizona law governs the contractual relations here. Arizona's statute of frauds provides that certain types of contracts must be in writing and signed by the party to be charged.[5]

The categories of contracts within the statute of frauds are familiar but vary across American jurisdictions. Arizona's statute of frauds, as codified in Arizona Rev. Stat. § 44-101, provides:

> No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized . . .

---

[5] Indeed, the Engagement Agreement also provides that any modification thereto must be in writing and signed by the parties. (Doc. 1-1, p. 5).

> 5.  Upon an agreement which is not to be performed within one year from the making thereof.

Ariz. Rev. Stat. § 44-101(5) (2019).

> As courts have observed:

>> To determine whether an agreement comes within this section, the proper inquiry is whether the contract is capable of being performed within one year of the agreement. This section has been interpreted as not applying to oral contracts when there is a possibility of performance within one year. When it is clear from the duration of the contract, however, that performance will not be completed within a year, the statute of frauds applies.

>> An oral contract creating a permanent arrangement in which the defendant's liability necessarily extends beyond a one-year period, without any term that may end the contractual relationship, is not capable of being performed within one year and falls within the statute of frauds.

*Rudinsky v. Harris*, 231 Ariz. 95, 99, 290 P.3d 1218, 1222 (Ct. App. 2012).

Federal courts applying Arizona law agree. *Western Chance No. 2, Inc. v. KFC Corp.*, 957 F.2d 1538, 1542 (9th Cir. 1992) (D. Ariz. appeal; alleged contract with time-indefinite territorial exclusivity term is within the statute of frauds because "no possibility of full performance within a year"); *Arnold & Assoc., Inc. v. Misys Healthcare Sys.*, 275 F.Supp. 2d. 1013, 1020-1022 (D. Ariz. 2003) (alleged contract to retain broker for 18 months within statute even though procurement of commissionable insurance transaction accomplished within weeks). At least one Fourth Circuit decision interpreting a similar one-year provision under Florida's statute of frauds is in accord. *Rizoti v. Plemmons*, 91 Fed. Appx. 793, 795-797 (2003) (alleged contract to contribute proceeds, comprised of principal and three years of interest from separate non-compete agreement, meant that performance would extend beyond one year).

Here, the Agreement makes plain that its duration lasts beyond one year: "This Engagement Agreement shall remain in force (the "Engagement Term") for a period of twelve

(12) months from the date of signing this Engagement agreement and may thereafter be terminated by either party upon thirty (30) days prior written notice." ((Doc. No. 1-1, p. 4).

So, the Agreement's initial period runs 13 months before terminable, beyond which the Agreement further contemplated a performance period of an additional two years ("…(c) if a Financing is consummated within two (2) years ("Trailer Term") of the termination of this Engagement Agreement, the Company shall remain obligated to pay a Transaction Fee…"). The law is clear that the Engagement Agreement falls within Arizona's statute of frauds.

Any contract that is within the Arizona statute of frauds may only be modified by a writing that itself satisfies the statute of frauds. *Snyder v. HSBC Bank, USA, N.A.*, 873 F. Supp. 2d 1139 (D. Ariz. 2012). The email exchanges upon which BSC relies for this modification defense not only lack sufficiently definite terms regarding the alleged modification (as Palas himself admits that subsequent oral agreements constitute further modifications (*see, e.g.*, First Palas Depo. 249:8-17)), but they do not constitute a written agreement signed by Plaintiff. Palas even admits this. (First Palas Depo. 240:1 ("So, you're right. It's not a signed Agreement.")).

Under the Arizona Electronic Transactions Act, Ariz. Rev. Stat. § 44-7001 et. seq, an "'Electronic signature' means an electronic sound, symbol or process that is attached to or logically associated with a record and that is executed or adopted by an individual *with the intent to sign the record*." Ariz. Rev. Stat. § 44-7002(8) (2019) (emphasis added). Moreover, "[t]his chapter applies only to transactions between the parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." Ariz. Rev. Stat. § 44-7005(B) (2019).

Here, the evidence at trial will show that Plaintiff never intended or agreed to conduct transactions by electronic means. The Engagement Agreement makes plain that the parties would only amend or modify the Engagement Agreement in a writing signed by both parties, and in each case where the Engagement Agreement was modified or where a proposed modification was presented, it was presented in a separate letter agreement to be holographically signed by the parties. In addition, the evidence at trial will show that Mr. Prassas did not have the required "intent to sign the record" in sending the referenced emails, as those were negotiations between the parties that increasingly featured two men arguing.

Plaintiff again urges that this modification issue should not be presented to the jury and will move, at the appropriate time, for judgment as a matter of law on this issue under Rule 50 of the Federal Rules of Evidence. To the extent the Court nonetheless submits this issue to the jury, the jury must be instructed as to the Arizona statute of frauds and as to the requirements for electronic signature under the Arizona Electronic Transactions Act.

**B. BSC's Counterclaim for Breach of Contract**

In support of its breach of contract claim, BSC alleges that Plaintiff breached the Engagement Agreement by not performing or providing all of the enumerated services listed in the Engagement Agreement. To be clear, at the time these transactions closed, BSC knew and understood that Plaintiff had not performed all of these enumerated services. (Doc. 72, pp. 10-11). Moreover, BSC's claim is not that Plaintiff did nothing, but more that Plaintiff did not do enough of these services under the Engagement Agreement.

Even in Palas's second deposition, wherein he changed his earlier testimony to support this newfound breach theory, Palas admitted that Plaintiff provided a "few advices [sic]", but simply did not provide enough according to BSC. (Second Palas Depo. 156:15-20). Moreover,

Palas testified in his first deposition of very specific examples of Plaintiff providing some services, as needed and as he was asked to do. (Doc. 60, p. 27).

### i. BSC cannot enforce vague and indefinite terms in the Agreement

At the summary judgment hearing, the Court asked how it could determine whether Plaintiff did enough of the enumerated services under the Engagement Agreement. Under black-letter contract law, the answer is that neither the Court nor the jury can make that determination because these nonessential terms of the Engagement Agreement are too indefinite to be enforced as a matter of law.

Under Arizona law and the Restatement (Second) of Contracts, "a contract's terms are sufficiently definite if 'they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Schade v. Diethrich*, 1987 Ariz. App. LEXIS 667 (Ct. App. Jan. 15, 1987), *aff'd*, 158 Ariz 1, 760 P.2d 1050 (1988) (quoting Restatement (Second) of Contracts (1981)). "Terms necessary for the required definiteness frequently include time of performance, place of performance, price or compensation, penalty provisions, and other material requirements of the agreement." *Pyeatte v. Pyeatte*, 135 Ariz. 346, 350, 661 P.2d 196, 200 (Ct. App. 1982). "If the undetermined matter does not preclude performance of the remainder of the contract and is of comparatively little importance, the uncertain promise may be left entirely unperformed and the remainder of the contract enforced." 1 Williston on Contracts § 4:31 (4th ed.).

Here, the material terms of the Engagement Agreement are sufficiently spelled out. As Palas testified, the purpose of the Engagement Agreement and the engagement was to find financing for the Projects and potentially BSC's other U.S. waste-to-energy projects. Indeed, the Engagement Agreement's trailer term provision reflects that purpose and sufficiently demonstrates that Plaintiff's performance under the Engagement Agreement was to involve

locating an investor willing to invest on terms acceptable to BSC. The other material terms of the Engagement Agreement involve the closing of a transaction, the receipt of cash by BSC, and the contract price based upon the type of financing obtained—not the level of services provided.

The Engagement Agreement makes plain its important terms: "*For the avoidance of doubt*, Advisor's right to any monetary compensation under this engagement letter shall only be triggered by and subject to the actual receipt of cash by the Company." (Doc. 1-1, p. 3 (emphasis added)). The parties made plain in the Engagement Agreement that the only triggering event for Plaintiff's right to compensation was the receipt of cash by the Company, which is defined as a "Closing." *Id.*

In other words, the only thing that is material under the Engagement Agreement is the "Closing" of a transaction with an investor located by Plaintiff. The list of services are superfluous, nonessential terms because if a "Closing" does not occur, Plaintiff has no right to payment of the Financing Fee regardless of the amount of services provided by Plaintiff.

In addition to being nonessential, those terms are too indefinite to be enforced. For example, regardless of the amount of services Plaintiff provided, BSC could always claim Plaintiff did not provide enough advice, or provide enough assistance, or approach enough investors, or solicit enough offers, and so on. There is nothing in the Engagement Agreement specifying the amount of services Plaintiff was to provide and, therefore, there is no basis upon which the Court or jury could determine the existence of a breach. The existence of a breach is solely reliant upon BSC's wish or whim to determine whether Plaintiff "did enough" or not.

What matters under the Engagement Agreement and the only way to determine whether Plaintiff is or is not entitled to payment thereunder is if a Closing occurs with an investor contacted by Plaintiff. Because the list of services are indefinite, nonessential terms, their

nonperformance cannot, as a matter of law, constitute a breach by Plaintiff, and this issue should not be presented to the jury.

To the extent the Court determines that the list of services is an essential term, the list of services is still too indefinite to determine whether or not Plaintiff "did enough" to satisfy those conditions. In such instance, under Arizona law, "the court can supply any missing terms consistent with the intent of the parties." *Antonson v. Red Mt. Med Spa, LLC*, 2015 Ariz. App. Unpub. LEXIS 785, *12 (Ct. App. June 11, 2015) (citing Restatement (Second) of Contracts, § 33 cmt. a).

As one Arizona Court noted:

> If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. . . . The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere wish, will, and desire exists, either by virtue of the agreement itself or by commercial practice or other usage or custom.

*AROK Constr. Co., v. Indian Contr. Servs.*, 174 Ariz. 291, 297, 848 P.2d 870, 876 (Ct. App. 1993).

Here, to the extent the Court determines that the list of services constitutes an essential term of the Engagement Agreement, the Court can supply the missing "term" concerning the amount of services Plaintiff was to provide. It is nonsensical to construe the Engagement Agreement to require Plaintiff to perform a service that is neither needed nor useful to accomplish the purpose of the Engagement Agreement and close a financing transaction. In other words, if a transaction closes without Plaintiff (or anyone for that matter) needing to

perform one or more of these services, it would not only be nonsensical but an unfair forfeiture to deny Plaintiff compensation on that basis.

As such, the only reasonable "gap-filler" is to construe the Engagement Agreement to provide that Plaintiff's role will include the enumerated services, *as needed*. Indeed, the parties themselves interpreted the Engagement Agreement in such a manner. BSC knew what Plaintiff had done and not done with respect to these list of services—specifically BSC knew that Plaintiff had not performed all of the enumerated services at the time—and BSC performed under the Engagement Agreement for years by paying $833,333 of the Financing Fee without protest (other than inability to pay) and without ever claiming that Plaintiff had failed to perform its obligations.

To the extent the Court determines that the list of services is an essential term, the Court should "fill the gap" of indefiniteness and provide such jury instruction to provide the jury with a reasonable and definite basis upon which the jury can determine whether or not a breach occurred. The only reasonable interpretation of the Engagement Agreement is that the list of services were to be performed "as needed" and the jury should be so instructed.

### ii. BSC waived any nonperformance of the Agreement by Plaintiff

Plaintiff has asserted waiver as an affirmative defense to BSC's breach of contract claim (Doc. 80, p. 7). There is sufficient evidence to present this defense to the jury and, in fact, sufficient evidence from which the Court can find that BSC waived any breach of contract by Plaintiff as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.

Under clear Arizona law, "waiver is an intentional relinquishment of a known right." *N. Ariz. Gas Serv. v. Petrolane Transp.*, 145 Ariz. 467, 476, 702 P.2d 696, 705 (Ct. App. 1984). "It may be express or inferred from conduct." *Id.* Whether a right has been waived is a question of

fact for the trial court." *Id.* "[A] party to a contract may waive a breach by permitting the breaching party to continue performance." *Id.* at 477, 702 P.2d at 706.

Here, Plaintiff expects the evidence at trial will show that BSC was aware at the time these transactions closed of Plaintiff's alleged deficient performance under the Engagement Agreement. (Second Palas Depo. 146:15-19). With that knowledge, not only did BSC partially pay the Financing Fee owed under the Engagement Agreement, but continued to reaffirm its willingness and intention to pay. For example, by email dated August 19, 2016, Palas, on behalf of BSC, stated:

> I completely understand what you doing now, why using the words "Breaching, refusing "we all that time discussing in good faith, reaching solutions and paying you, just in August you received 100,000$, so I reject all your arguments, did I ever refused to pay you? Give me one example, one, that I refused to pay.

(Doc. 56-3).

BSC never raised, at any point prior to this litigation, that Plaintiff had not performed as required and was not entitled to payment under the Engagement Agreement. Most importantly, BSC never terminated the Engagement Agreement, and Plaintiff continued to perform under the Engagement Agreement by seeking additional investors for these Projects and working with BSC to find additional projects in the United States and additional investors for BSC's overseas projects. Because BSC was aware of Plaintiff's alleged deficient performance, never attempted to enforce its rights to avoid payment under the Engagement Agreement, and permitted Plaintiff to continue performance under the Engagement Agreement for years, BSC waived any breach of contract by Plaintiff.

### i. BSC is estopped from claiming a breach of contract by Plaintiff

In addition to waiver, Plaintiff also asserted estoppel as an affirmative defense. (Doc. 80, pp. 5-6). Although similar to waiver, Arizona courts have defined equitable estoppel as:

> [T]he effect of the voluntary conduct of a party, whereby he is absolutely precluded from asserting rights which might have otherwise existed as against another person who, in good faith, has relied upon such conduct and has been led thereby to change his position for the worse. The essential elements of estoppel are that [BSC], with knowledge of the facts, must have asserted a particular right inconsistent with that asserted in the instant action, to the prejudice of [Plaintiff] who has relied upon his first conduct.

*Heckman v. Harris*, 66 Ariz. 360, 362-63, 188 P.2d 991, 992-93 (1948) (citations omitted).

As stated above, BSC has admitted that it was fully aware of Plaintiff's performance, or lack thereof, at the time these transactions closed. With that knowledge, BSC never asserted breach, never claimed that Plaintiff had failed to perform, never refused to pay Plaintiff, and never terminated the Engagement Agreement. In reliance upon BSC's conduct, Plaintiff continued to perform under the Engagement Agreement and delayed initiating any enforcement action for approximately two years thereby permitting BSC additional time to delay payment while receiving additional funds, in the form of development fees or otherwise, and obtaining additional and substantial loan proceeds by pledging its assets—all to the detriment of Plaintiff.

As with Plaintiff's waiver defense, there is sufficient evidence to present the estoppel defense to the jury and, in fact, sufficient basis from which the Court can find that BSC is estopped from asserting a breach of contract by Plaintiff as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.

### ii. BSC cannot present any evidence of specific damages suffered as a result of Plaintiff's alleged nonperformance

Under the doctrine of substantial performance, "[c]omplete, absolute performance is not required." *Matson v. Bradbury*, 40 Ariz. 140, 144 (1932). "For slight deviations or omissions defendant would be entitled to recoup but not entirely to defeat recovery." *Id.*

As explained previously, Plaintiff substantially performed its obligations under the Engagement Agreement, as the purpose of the contract and the reason for why BSC engaged Plaintiff was "[t]o find for us financing for those projects." (First Palas Depo. 40:22-23; 50:6-8 ("This is why we hired [Plaintiff], actually, to look for – for equity, look for financing, you know, for the project.")). Plaintiff "absolutely" found an investor (York) who was willing to and who did finance BSC's Projects on terms acceptable to BSC. (First Palas Depo. 90:8-13).

As a result of Plaintiff's substantial performance, BSC is limited to recouping its damages incurred to remedy the alleged deviations or omissions in Plaintiff's performance. BSC cannot simply claim the $833,000 paid to Plaintiff constitutes its damages because under the substantial performance doctrine, BSC is obligated to pay the full amount owed less recoupment of specific damages to cure the alleged nonperformance.

But even assuming Plaintiff did not substantially perform, BSC has not, and still cannot, present any evidence of damages resulting from Plaintiff's nonperformance. As explained above, BSC has neither offered nor disclosed in discovery any evidence of any alleged damages suffered by BSC as a result of Plaintiff's alleged nonperformance. The evidence will show that Plaintiff did everything it was asked and needed to do with respect to these transactions and that BSC did not need or ask Plaintiff to do anything that it did not do. BSC cannot present any evidence of specific damages sufficient to allow this issue to go to the jury.

This the 1st day of July, 2019.

RAYBURN COOPER & DURHAM, P.A.


By: /s/ Benjamin E. Shook
James B. Gatehouse
N.C. State Bar No. 22811
bgatehouse@rcdlaw.net
Benjamin E. Shook
N.C. State Bar No. 44793
bshook@rcdlaw.net
227 W. Trade St., Suite 1200
Charlotte, NC  28202
Tel. (704) 334-0891
Fax (704) 377-1897

*Attorneys for Plaintiff*