UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-131-RJC-DCK

| PRASSAS CAPITAL, LLC, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | ORDER |
| BLUE SPHERE CORPORATION, | ) | |
| Defendant. | ) | |

**THIS MATTER** comes before the Court on three pending motions: (1) Defendant Blue Sphere Corporation's ("BSC") Motion to Exclude Expert Testimony, (Doc. No. 98); (2) BSC's Motion in Limine, (Doc. No. 100); (3) Plaintiff Prassas Capital, LLC's ("PC") Motion in Limine, (Doc. No. 102); and the parties' associated briefs and exhibits. The motions are ripe for adjudication.

This is a contract dispute case. At summary judgment, the Court entered partial summary judgment and dismissed PC's counterclaim for indemnification and BSC's counterclaim for fraud in the inducement. The remaining claims for trial are (1) PC's claim for breach of contract and (2) BSC's counterclaim for breach of contract.

I.   **LEGAL STANDARD**

Relevant evidence—that which has a tendency to make a consequential fact more or less probable—is generally admissible. Fed. R. Evid. 401–02. Relevant evidence is excludable if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

II.   **DISCUSSION**

A.   Broker-Dealer ("B-D") Defense

Most of the pending motions revolve around the dispute of admitting the testimony of BSC's expert William Jannace ("Jannace"). The majority of Jannace's thirty-five-page report discusses the B-D defense and alleges that PC violated securities laws. Therefore, a threshold issue to adjudicating the pending motions is deciding whether BSC can present any evidence, argument, or reference to the B-D defense.

1.   The Court's Prior Rulings Regarding the B-D Defense

Initially, BSC argued that the Agreements between the parties were voided from the moment of their execution because they violated the Securities Exchange Act ("SEA"). Section 15(a)(1) of the SEA mandates that brokers and dealers must be registered with the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78o(a)(1).[1] Citing this provision, Defendant alleged that, because

---

[1] "It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose

2

Plaintiff was not a registered broker-dealer, the agreements between the two parties were void from the start. Defendant relied on Section 29(b) of the SEA to make this argument, which provides that contracts made in violation of the SEA and contracts in which its performance would involve a violation of the SEA shall be void. 15 U.S.C. § 78cc(b).[2] The Court was not persuaded by BSC's argument.

In the Court's earlier Order on BSC's Motion to Dismiss, the Court "delved into the agreements' validity" and "agreed with Plaintiff that, under the Supreme Court's ruling in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386–87 (1970), contracts violating the SEA are not void *per se*." (Doc. No. 42 at 7). Rather, the Court noted that "Section 29 renders the 'contract merely voidable at the option of the innocent party.'" (Id. (quoting Mills, 396 U.S. at 386–87)).[3] Subsequently, the Court held that "[e]ven if Plaintiff's actions in executing the Agreement were to exceed the excused conduct of [an exemption to the Section 15 registration requirement], Defendant at no point rescinded the contract under Section 29(b) of the SEA," and concluded that Defendant "fundamentally misconstrued Section 29(b)

---

business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section."

[3] The Court also noted that "Defendant signed a six-page contract that clearly shows Plaintiff was not a registered broker or dealer," pointing to the provision which states that PC "will include an affiliate registered broker/dealer if the securities are transacted; who understands that the availability of a securities law exemption for the Financing may depend on such status[,] (Doc. No. 1-1 at 6)." (Doc. No. 42 at 9).

of the SEA." (Id. at 9, 16). The Court echoed this finding in its Order on BSC's Motion for Judgment on the Pleadings. (Doc. No. 43).

And again, at the summary judgment stage, the Court held, "to narrow the issues for trial, . . . Section 29(b) of the [SEA] does not bar PC from recovering on its breach of contract claim." (Doc. No. 97 at 2). "Because the Court has already found that BSC 'at no point rescinded the contract,' . . . this affirmative defense is of no avail to BSC and should be stricken." (Id.). The Court also held that the affirmative defense was time-barred because BSC's alleged right to seek rescission expired nearly eleven months before this action was filed, and as such, held that "BSC cannot plead this defense at trial." (Id. at 2–3 (citing Alpha Capital Anstalt v. Oxysure Sys., Inc., 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016)).

### 2. B-D Defense as it Relates to Illegality

Despite not pleading illegality as an affirmative defense initially, at the status conference held on May 29, 2019, BSC indicated that, as it understood the Court's Summary Judgment Order, it still had the option of raising the defense of illegality. BSC indicated that this defense would involve the same underlying misconduct which would be a violation of the broker-dealer rule. And now, in its briefing on the pending motions in limine and motions to exclude expert testimony, it has resurrected the B-D defense, arguing that "[a]lthough the parties' agreement itself does not violate the [SEA], *per se*, PC's performance under that agreement did violate the Exchange Act" and contends that the only way PC can recover for breach of contract is to establish that it performed under the contract—

4

something BSC alleges would entail violation of securities laws. (Doc. No. 104 at 4). In support of this argument, BSC regurgitates, in large part, the same case law that it included in its summary judgment briefing.

BSC should not be allowed to resurrect the B-D defense the Court has found inapplicable by relabeling it as an "illegality" defense. The Court now finds that (1) BSC was required to affirmatively plead the defense of illegality under Federal Rule of Civil Procedure 8 but failed to do so, and (2) the law-of-the case doctrine[4] prevents B-D from relitigating the B-D defense. Additionally, the Fourth Circuit has held that a plaintiff should not be precluded from maintaining its action for breach of contract due to its own violation of securities laws. Occidental Life Ins. Co. of N.C. v. Pat Ryan & Assocs., Inc., 496 F.2d 1255, 1265–67 (4th Cir. 1974). In reaching this conclusion, the Fourth Circuit noted that it did "not think Section

---

[4] The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." United States v. Moussaoui, 483 F.3d 220, 232 (4th Cir. 2007). This doctrine promotes "finality and efficiency [in] the judicial process[,]" Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988), and is based on the "sound policy that when an issue is once litigated and decided, that should be the end of the matter." United States v. U.S. Smelting Refining & Mining Co., 339 U.S. 186, 198 (1950). The doctrine requires courts to uphold earlier decisions in the same case unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." Sejman v. Warner–Lambert Co., 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks omitted). Here, none of the three exceptions apply, and therefore, the Court is bound by its prior rulings which have conclusively held that "Section 29(b) of the [SEA] does not bar PC from recovering on its contract claim." (Doc. No. 97 at 2).

5

29(b) has such a devastating meaning," as to render void all contracts the performance of which involves the violation of securities laws. Id. at 1265–66 (citing Mills, 396 U.S. at 386–87, the Supreme Court case the Court relied on in its prior orders to find that the contract was voidable, not void).

The Court will **EXCLUDE** all evidence regarding BSC's prior claim or defense that PC violated the SEA by not being a registered broker-dealer.

### B. Expert Testimony

BSC claims that, even if the Court chooses to exclude Jannace's testimony regarding the illegality of the contract (i.e., the B-D defense), Jannace's testimony regarding (a) the security industry requirements for operating as a finder, (b) the distinction between a finder and a financial adviser or broker-dealer, and (c) other material aspects of the regulated financial industry that bear upon how the contract was (or was not) performed would inform and assist the jury.

#### 1. Jannace's Report

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert testimony and requires, among other things, the production of a written report setting forth "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). It is well-established that "expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." U.S. Bank N.A. v. PHL Variable Life Ins. Co., 112 F. Supp. 3d 122, 132 (S.D.N.Y. 2015).

Here, Jannace's thirty-five-page report almost entirely focuses on how PC supposedly violated securities laws by not being registered as a broker-dealer. The report expressly states that Jannace was "asked to evaluate whether [PC] should have affiliated a registered representative [(i.e., a broker-dealer)] under the securities laws of the United States related to its activities pursuant to a Letter Agreement with [BSC]." (Doc. No. 72-2 at 3). Jannace summarizes his two primary opinions as follows:

> **Opinion #1:** Prassas should have registered as a broker-dealer as its activities did not fall within guidance issued pursuant to relevant SEC No-Action letters, including the January 2014 M and A No-Action relief issued. While arguably it engaged in activities that would have enabled it to register as a CAB under FINRA Rules, it nevertheless would be required to be registered broker-dealer.
>
> **Opinion #2:** Because Prassas violated federal securities laws and SRO rules regarding registration requirements, he should not receive compensation for services that required either registration as a broker-dealer under the federal securities, an exemption as an associated person of a broker-dealer, or no-action relief from broker-dealer registration requirements.

(Doc. No. 72-2 at 3).

Although the Court notes that Jannace meets the qualifications to testify as an expert under <u>Daubert</u> and Federal Rule of Evidence 702(a), in light of the Court's determination to exclude any and all evidence relating to the B-D defense, the Court also finds it proper to **EXCLUDE** Jannace from testifying. The issue of whether PC's conduct amounted to a violation of securities laws—the issue and opinion that pervades Jannace's report—is no longer a fact of consequence in this action. As such, Jannace's testimony

7

regarding the B-D defense and PC's alleged violation of securities laws should be **EXCLUDED** as irrelevant under Federal Rules of Evidence 401 and 702(a).

Additionally, although arguably, Jannace's testimony could be somewhat helpful to the jury on other matters, allowing Jannace to testify regarding the securities industry and finders' roles in that industry would likely confuse the jury, complicate the issues, and unduly delay the trial of this breach-of-contract case. While the Engagement Agreement might discuss and involve matters involving securities, the central issues are primarily (1) breach, (2) substantial performance, (3) modification, and (4) damages. (See Doc. Nos. 106, 114: Parties' Statements of Issues). Focusing on securities laws and the securities industry would distract the jury from the key issues. Moreover, Jannace, a non-party to the contract at issue, cannot testify to the parties' intent in forming the contract—something paramount to resolving this case. Accordingly, the Court finds that Jannace's testimony should be **EXCLUDED** altogether under Federal Rules of Evidence 401–403 because it is largely irrelevant and "its probative value is substantially outweighed by a danger of" causing unfair prejudice, confusing the issues, misleading the jury, unduly delaying trial, and wasting time. Fed. R. Evid. 403.

## 2. West's Report

Because the Court has excluded the testimony of BSC's expert, it also finds it proper to exclude the expert testimony of PC's expert, West, for the same reasons. West's report was only procured to counter Jannace's report, and PC has indicated that it has no intent of offering expert testimony unless the Court allows Jannace to testify. Therefore, the Court will **EXCLUDE** West's testimony.

## C. Other Issues or Topics the Parties Have Asked to Exclude

The following additional issues raised are addressed below.

### 1. Intent of the Parties

BSC argues that, because the language of the Letter Agreement is clear and unambiguous, the Court should "give effect to the contract as written." Grosvenor Holdings, L.C. v. Figueroa, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) ("A general principal of contract law is that when the parties bind themselves by a lawful contract, the terms of which are clear and unambiguous, a court must give effect to the contract as written.").[5] "The purpose of contract interpretation is to determine the parties' intent and enforce that intent." Id. The interpretation of a contract is to be guided by the contract as a whole and the surrounding circumstances. Dialog4 Sys. Eng'g GmbH v. Circuit Research Labs, Inc., 622 F. Supp. 2d 814, 822 (D. Ariz. 2009). "Antecedent understandings and negotiations

---

[5] It is undisputed that Arizona law governs this dispute due to the choice-of-law provision contained in the Agreement. (See Doc. No. 1-1: Engagement Agreement ("Agmt.") at 5–6, § I).

9

may be admissible . . . for purposes other than varying or contradicting a final agreement." Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1138 (Ariz. 1993). In such instances, a "judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." Id. at 1140 (citations omitted). This does not violate the parol evidence rule "because the evidence is not being offered to contradict or vary the meaning of the agreement[;] [t]o the contrary, it is being offered to explain what the parties truly may have intended." Id. "Where contract language is susceptible to more than one interpretation, the matter should be submitted to the jury." State v. Mabery Ranch, Co., 165 P.3d 211, 219 (Ariz. Ct. App. 2007).

Because the Letter Agreement states that PC shall provide "Investment Banking Services" and enumerates ten services that PC agreed to provide to BSC, BSC argues that the parties' intent was reflected in the clear and unambiguous language of the contract.[6] But, the parties' inclusion of the Trailer Term,[7] as well as

---

[6] See Emp'rs Mut. Cas. Co. v. DGG & CAR, Inc., 183 P.3d 513, 518 (Ariz. 2008) (en banc) ("When 'the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there.'" (citations omitted)).

[7] This is sometimes referred to as a "tail period." "A tail period is the period of time (typically one year) after the engagement has terminated . . . during which the financial advisor will still receive the success fee if a transaction is ultimately consummated." The Engagement Letter—Economics—Tail period, Rumberger, The Acquisition and Sale of Emerging Growth Companies: The M&A Exit § 3:13. Here, the parties included a Trailer Term requiring BSC to pay PC its Financing Fee up to two years after termination of the Agreement if a Financing is consummated

10

the inclusion of undefined terms such as "affiliate"—a term which BSC has previously conceded is ambiguous—undercuts BSC's argument.

At summary judgment, both parties argued that the Court could determine as a matter of law what the Engagement Agreement required regarding PC's performance. In denying summary judgment on that issue, the Court determined that the parties' interpretations of the Engagement Agreement warranted jury determination.[8] The primary purpose of the contract is disputed and there is conflicting evidence in the record as to whether the contract was primarily for finding or investment advisory services. Because the jury will not be able to resolve the issues of breach and substantial performance without first determining what the purpose of the contract was, evidence regarding the parties' intent is crucial to resolving this dispute. Therefore, BSC's request to exclude evidence regarding the parties' intent is **DENIED**.

    2.    <u>PC Accomplishing the Investment Advisory Services Enumerated in the Agreement</u>

BSC asks the Court to prevent PC from making arguments inconsistent with certain statements Prassas made in his deposition. BSC also argues that PC cannot present evidence allegedly inconsistent with Prassas's

---

within two years of termination of the Agreement for which PC contacted the acquiring/investing party regarding such transaction prior to termination of the Agreement. (See Agmt. at 5, § D).

[8] See Beaudry v. Ins. Co. of the W., 50 P.3d 836, 841 (Ariz. Ct. App. 2002), as amended (July 26, 2002) (reversing a trial court for granting summary judgment in the defendant's favor when the documents and other evidence could support conflicting inferences regarding the terms of the parties' agreement").

deposition testimony, such as "questions to [BSC] and/or Palas as to whether PC performed its duties under the contract." (Doc. No. 101 at 5).

The issue of substantial performance is key in resolving this dispute; therefore, questions that go to the primary purpose of the contract and substantial performance should not be excluded. Moreover, if the Court were to find that Prassas's statements constituted judicial admissions, then it should also find that Palas's conflicting testimony also constitute judicial admissions. But the Court has previously ruled that the veracity of Palas's testimony was "best left to cross-examination at trial." (Doc. No. 97 at 7). Accordingly, BSC is free to cross-examine Prassas and to impeach him if it believes his testimony is inconsistent with his deposition testimony, and the Court **DENIES** BSC's motion in this regard.

> 3. BSC's Financial Condition, Ability to Pay Debt, or Other Litigation

BSC asks the Court to exclude evidence, argument, or reference to BSC's financial condition, ability to pay debt, or other litigation. The Court agrees that the parties' current relative wealth, ability to pay debt, or other unrelated litigation has no relevance to any claim or defense and would be unfairly prejudicial and should be excluded under Federal Rules of Evidence 401–03. However, the issue of BSC's financial position and ability to pay debt during the course of PC and BSC's relationship is relevant to BSC's modification defense. BSC's financial position at that time gives context to the emails between the parties regarding potential modification of the Agreement. Additionally, the issue of BSC's financial condition is inextricably intertwined with the other evidence in the case. The

inception of the parties' relationship depended, at least in part, upon BSC's need for financing. And BSC's financial condition in or about September 2014 (when BSC's "equity financing fell through" for the NC and RI Projects) is what prompted BSC to re-approach PC (and others) "to identify a source for replacement financing for the NC and RI Projects." (Doc. No. 112: Joint Stipulation of Facts ¶¶ 14–15). It is hard to imagine how the issues of BSC's past financial condition and ability to pay debt could be taken out of the case, and therefore the Court **DENIES** BSC's request as it relates to evidence of BSC's past financial condition and ability to pay, but **GRANTS** BSC's request as it relates to evidence regarding (1) BSC's financial position and ability to pay debt after the termination of the parties' relationship and (2) BSC's other litigation.

4. BSC's Identity as a Foreign Entity and Palas's Foreign Citizenship

BSC asks the Court to exclude evidence, argument, or reference to BSC's identity as a foreign entity and Palas's foreign citizenship. The Court agrees that the foreign citizenship argument is not relevant to any claim or defense and should be excluded under Federal Rules of Evidence 401–03. Nonetheless, the Court is mindful of the practical difficulties presented by excluding any evidence tending to show BSC's and Palas's foreign identities. The Court will hold PC to its representations that it has no intention to highlight this evidence or make any issue of it.[9] The Court will not require the parties to redact documents tending to show

---

[9] PC states that many documents—including BSC's public filings and deal-related documents—contain BSC's or Palas's addresses, describe BSC as a foreign company

13

that BSC and/or Palas are foreign. Therefore, the Court **GRANTS** BSC's request as it relates to any arguments as to BSC's and Palas's foreign identities, but it will not order the parties to redact all documents tending to show their foreign identities.

     5.     <u>Reference to Discovery Disputes</u>

BSC argues that the various discovery disputes that have occurred in this case, including Plaintiff's Motion for Sanctions, (Doc. No. 89),—which the Court ultimately denied—should be precluded from being introduced as evidence into this dispute. The fact that PC filed a motion for sanctions should be excluded. But the evidence on which PC based its motion—Palas's conflicting testimony and BSC's alleged withholding of relevant information during Palas's testimony—is relevant to BSC's and Palas's credibility. Therefore, the Court **GRANTS** BSC's request as it relates to introducing evidence showing that PC filed a motion for sanctions, but **DENIES** BSC's request as it relates to evidence regarding Palas's conflicting testimony and BSC's alleged withholding of relevant information during Palas's testimony.

     6.     <u>Changing Themes or Litigation Strategies and Prior Motions Practice.</u>

BSC asks the Court to preclude PC from introducing evidence, argument, or reference to changing themes or litigation strategies and prior motions practice. PC has argued that (1) BSC has attempted to change its

---

or Palas as an Israeli citizen, and have portions of emails that are written in Hebrew.

litigation strategy and should not be allowed to mend its hold; (2) BSC's initial theme of this case was that Plaintiff performed so many functions and was so involved in these transactions that Plaintiff should have registered as a broker-dealer, and Palas's first deposition testimony was given before that defense proved untenable; and (3) BSC not only changed its legal theory, but it also changed its story about the facts of this case.

PC contends that in order to provide the jury with an explanation and understanding as to why Palas's deposition testimony changed, and to counter BSC's proffered justification for Palas's testimony changing (i.e., Prassas's intervening deposition testimony), PC must be able to effectively cross-examine Palas and introduce evidence regarding BSC's shifting positions and changing litigation themes.

Allowing PC to present this evidence inevitably raises the risk that the issue of the B-D defense—something which PC itself has asked the Court to exclude—will be injected into the case, resulting in the potential for confusion of the issues, misleading the jury, and unfairly prejudicing BSC. The jury can assess Palas's credibility from Palas's own testimony without hearing PC's purported explanation for why Palas changed his testimony. Moreover, the mend-the-hold doctrine is an equitable doctrine and something for the Court to decide, not the jury.[10] Here, the

---

[10] "The 'mend the hold' doctrine is 'an equitable doctrine that precludes the assertion of inconsistent litigation positions, usually concerning the meaning of a contract, within the context of a single lawsuit.'" Strategic Outsourcing, Inc. v. Cont'l Cas. Co., 274 F. App'x 228, 234 (4th Cir. 2008) (quoting Whitacre P'ship v. Biosignia, Inc., 591 S.E.2d 870, 886 (N.C. 2004)).

central issue is the breach-of-contract claims, and therefore, evidence regarding changing litigation tactics or prior motions practice (including the Court's dismissal of certain claims and counterclaims) should be excluded under Federal Rules of Evidence 401–403. Therefore, the Court **GRANTS** BSC's request as it relates to changing themes or litigation strategies and prior motions practice.

7. <u>PC's Work as a Registered Investment Advisor ("RIA") and Related RIA Disclosures</u>

In its Motion in Limine, PC asks the Court to exclude any evidence or argument related to PC's conduct or registration as an RIA. According to PC, "[a]n RIA typically advises high-net-worth individuals on investments and manages client investment portfolios." (Doc. No. 103 at 7). PC claims that while it performed money management services in "the distant past" on "a somewhat regular basis," it is "winding down that portion of the business and currently has only small account account[s] under management": "[a]ny other RIA activity performed by PC is limited to specific, special purpose consulting work unrelated to PC's work for BSC as a financial advisor." (Id.). Both parties agree that PC was not providing investment advisory services to BSC as an RIA. Therefore, PC argues that any evidence related to PC's work or registration as an RIA is irrelevant as to the issues in dispute in this trial under Rule 401 and maintains that allowing this evidence would likely confuse or mislead the jury and would waste time. (Id. at 8). The Court takes a different stance.

Delving into the substance of PC's work as an RIA would be irrelevant and would waste time and confuse the jury. Nevertheless, the Court determines that evidence related to PC's status as a former RIA and PC's RIA-related disclosure documents that potentially implicate (or arguably should have implicated) PC's work with BSC are relevant and probative of PC's competency and state of mind in entering, executing, and performing the services outlined in the Engagement Agreement. Because this dispute centers on the "financial advisory services" that PC should or should not have performed for BSC, (Agmt. at 2), evidence of PC's status as a former RIA is probative of PC's general knowledge of and competency in performing financial advisory or investment services to clients—including BSC. Because the contract at the heart of this case involves financial advisory services—something which PC also performed as an RIA, although those services differed in substance, obligations, and duties—evidence of the knowledge PC would have had as an RIA could be probative of PC's state of mind and intent when it entered into the Engagement Agreement with BSC. As mentioned *supra*, the parties' intent is crucial to resolving this dispute. Additionally, the RIA-registration documents loosely concern BSC in the sense that PC claimed, in the section asking about other business outside of investment advisory business conducted by PC, that it did not engage in performance fee arrangements like the one it is currently claiming with BSC.

As such, the Court will admit this evidence with a limiting instruction (if proffered), instructing the jury that it is only to consider this evidence as to PC's

state of mind and competency in forming the Engagement Agreement and performing under the Agreement. Therefore, PC's request regarding this evidence is **DENIED**.

IV. **CONCLUSION**

**IT IS THEREFORE ORDERED THAT:**

1. BSC's Motion to Exclude Certain Expert Testimony and Any Report for Plaintiff if Defendant's Expert is Precluded from Testifying, (Doc. No. 98), is **DENIED IN PART** and **GRANTED IN PART**. That is, the Motion is **DENIED IN PART** as to BSC's request to allow its expert Jannace to testify, but **GRANTED IN PART** as to BSC's request to exclude PC's expert West from testifying. The Court will **EXCLUDE** Jannace's and West's testimony;

2. BSC's Motions in Limine to Exclude Certain Evidence and Arguments, (Doc. No. 100), is **DENIED IN PART** and **GRANTED IN PART**. That is, **DENIED IN PART** as to BSC's request to exclude evidence, argument, or reference to (1) the intent of the parties in executing the agreement, (2) PC accomplishing the investment advisory services enumerated in the Agreement, (3) BSC's financial condition and ability to pay debt immediately prior to and during the parties' relationship, and (4) Palas's conflicting testimony and BSC's alleged

withholding of relevant information during Palas's testimony. The Motion is **GRANTED IN PART**, and the Court will **EXCLUDE** evidence, argument, or reference to (1) BSC's financial position and ability to pay debt currently or at any time after the termination of the parties' relationship, (2) evidence, argument or reference to the fact that PC filed a motion for sanctions due to discovery disputes, (3) changing themes or litigation strategies and prior motions practice, (4) argument about BSC's identity as a foreign company and Palas's identity as a foreign businessman; and

3. PC's Motion in Limine, (Doc. No. 102), is **GRANTED IN PART** and **DENIED IN PART**. That is, the Motion is **GRANTED IN PART** and the Court will **EXCLUDE** evidence, argument, or reference to (1) BSC's previous claim or defense that PC violated the SEA by not being a registered broker-dealer, (2) expert testimony, and (3) the substance of PC's work as an RIA. The Motion is **DENIED IN PART** and the Court will **ALLOW** evidence regarding PC's registration and services provided as an RIA, but will include a requested **LIMITING INSTRUCTION** that the jury is to consider this evidence only as it relates to PC's state of mind and competency in forming the Engagement Agreement and performing under the contract.

Signed: July 3, 2019

Robert J. Conrad, Jr.
United States District Judge